**Howard JAMISON, Administrator of the Estate of Albert Tucker, Deceased, Plaintiff,**

v.

**A. M. BYERS COMPANY, a corporation. Defendant.**

**Civ. A. No. 60–73.**

United States District Court
W. D. Pennsylvania.

Oct. 19, 1962.

Dennis Harrington, Pittsburgh, Pa., for plaintiff.

James J. Burns, Jr., Pittsburgh, Pa., for defendant.

WILLSON, District Judge.

In this diversity death action tried to a jury the verdict favored the plaintiff as the Administrator of the Estate of Albert Tucker. Pennsylvania law applies as the accident and other operative facts occurred in the City of Pittsburgh in this judicial district. Suit was brought under both the Pennsylvania Wrongful Death Act, 12 P.S.Pa. § 1601 et seq. and Survival Act, 20 P.S.Pa. § 320.601 et seq. Under the Wrongful Death Act the jury awarded $104,805.00. Under the Survival Act the award was $45,000.00, making a total verdict of $149,805.00. During the course of the trial defendant filed timely Motions for Directed Verdicts and has filed post-trial Motions for a New Trial as well as for Judgment N.O.V.

Albert Tucker was born December 5, 1935, and was killed on February 3, 1959 at the defendant's plant while engaged in the process of installing shoring in a ditch which was being dug pursuant to a contract between defendant A. M. Byers Co., and Allegheny Contracting Industries, Inc. The work was actually being done by Allegheny. The work had been commenced the day before the accidence, that is February 2, 1959. The trench was being dug at the north end of defendant's warehouse. The day before the accident equipment had been brought to the scene but very little work had been done other than to break up the surface of the ground. At 8:00 A.M. on the 3rd of February a backhoe started to dig the trench. The trench was to be 20 feet deep and 5 feet wide. Approximately 15 feet of the trench had been dug before the shoring was started. Decedent was a carpenter's helper. He was working with one Kenneth May who was the carpenter in charge. Both men were building the forms for the shoring on the outside of the ditch, each form being more or less 10 feet long and 5 feet high. Each form was then put into the trench by hand, lowering them by use of ropes. One form was then placed on top of the other and then the planks were placed in the side and the forms were braced with four by fours placed perpendicularly across the ditch. At approximately 2:30 P.M., while the work was going on, a cave-in occurred after some 25 feet of the ditch had already been shored by both employees. About 8 to 10 feet remained unshored when suddenly, without warning, the shored portion of the trench caved in, trapping decedent and Mr. May in the trench where they suffocated.

The case was tried under the theory advanced by plaintiff's counsel that the applicable law was that found in Section

414 of the Restatement of Torts. That section reads:

"§ 414. Negligence in Exercising Control Retained by Employer.

"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for bodily harm to others, for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

Defendant's counsel, on the other hand, says that the applicable principle of law which should have been applied to the facts is Section 409 of the Restatement of Torts which reads:

"§ 409. General Principle.

"Except as stated in §§ 410 and 429, the employer of an independent contractor is not subject to a liability for bodily harm caused to another by a tortious act or omission of the contractor or his servants."

During the course of the trial I had before me Judge Egan's decision in Quinones v. Township of Upper Moreland, etc. Pa., 187 F.Supp. 260 (E.D. Pa., 1960), affirmed in part in the opinion of Judge Kalodner, Quinones v. Township of Upper Moreland, 293 F.2d 237 (C.C.A. 3, 1961); and also Spinozzi v. E. J. Lavino & Company, 243 F.2d 80, (C.C.A. 3, 1957). Defendant's counsel strenuously contends that the written contract between Byers and Allegheny relieves Byers of responsibility because Allegheny is a qualified independent contractor and worked under plans prepared by an engineer. The contract between the parties was the first exhibit offered into evidence. Plaintiff contends, and the court agrees, that the wording of the contract left a factual issue as to whether such control had been retained by the owner, that is Byers, so as to permit recovery on the theory that Byers, having retained the right to control and having failed to exercise it, it became responsible for Tucker's death

if the jury found negligence. The Quinones case was used as the basis for my charge to the jury. Factually speaking, the instant case is four square with the facts developed by Judge Kalodner in the Quinones decision. The only exception might be that in Quinones I am not certain that the decedent was himself engaged in the act of shoring. He was an employee of the contractor, but his exact duties in the trench when he was killed were not shown in the opinion. In the instant case, however, the decedent Tucker was in the trench assisting Mays in the shoring operation. At this point it is to be observed that the issue of contributory negligence was left to the jury and the jury instructed that if the decedent Tucker was found to be guilty of contributory negligence, then there could be no recovery. The evidence showed that Tucker was but 23 years of age at the time of his death. He had had but little experience in the type of work in which he was engaged. His classification was that of a semi-skilled laborer. Under the evidence and the law as indicated in Section 414 and the cases cited, this Court felt at the trial that the issue of control was for the jury, and having heard the post-trial motions and studied the briefs and reviewed the decisions cited, I am still satisfied that the issue was one solely to be decided by the jury. However, I am satisfied that if the case had been tried non-jury, the wording of the contract, together with the other evidence, would have compelled a decision in the plaintiff's favor.

At the oral argument and in briefs, defendant contends that the principle set forth in Section 414 is the exception to that in Section 409 and that the exception cannot be applied in favor of the employees of the independent contractor. Defendant contends that the phrase "to others" spoken of in Section 414 refers to third persons such as passers by and other members of the public and is not intended to protect one such as decedent who is engaged in the very act which resulted in the harm.

Defendant cites several Pennsylvania decisions. The first of these is Pender v. Raggs, et al., 178 Pa. 337, 35 A. 1135 (1896). Defendant says that the Circuit Court in the Spinozzi case misinterpreted the law of Pennsylvania by citing this as authority. But in that case the Court held that the question of interference or control was a question for the jury. An employee of a sub-contractor working under an independent contract was injured and recovered. In Stork v. Philadelphia, 199 Pa. 462, 49 A. 236 (1901), the City retained the right in its contract to determine when shoring and underpinning was necessary during the construction of a subway. The City refused to authorize shoring in that case and a homeowner suffered damage to his house. Again it was a question for the jury. And, in McGrath v. Pennsylvania Sugar Co., 282 Pa. 265, 127 A. 780 (1925), an employee of an independent contractor was injured when the defendant, through an assistant foreman, issued instructions as to how the employee was to perform certain work. Again the question was one for the jury as to whether control was exercised. In none of these three cases was there any discussion by the Court with regard to recovery by a third person as distinguished from an employee of an independent contractor. It is to be noticed that in two of the three cases, plaintiffs were employees and were permitted to recover. The three cited cases were decided before the adoption of the Restatement in 1934. Thus the Pennsylvania law, even before the adoption of the Restatement, was in accord with the Restatement and the case relied on by the Court in charging the jury. Defendant's counsel has simply failed to uncover any Pennsylvania decision that would indicate that the law of Pennsylvania is different than the law set forth in the Quinones or Spinozzi decisions.

On the issue as to whether defendant retained control of the work, defendant contends that not only does the contract show that no control was retained but defendant goes further and asserts that there was no jury issue on this point because the Court should construe the contract as a matter of law in Byers' favor. It should be emphasized that the Restatement, Section 414, says one who "retains the control of any part of the work is subject to liability * * * which is caused by his failure to exercise his control with reasonable care." The phrases in the contract which the Court believes are for the jury in making the determination on the issue of control are, in part:

"1.05 ENGINEER'S STATUS. The Engineer shall have authority to stop the work whenever such stoppage may be necessary to insure the proper execution of the Contract. He shall also have authority to reject all work and materials which do not conform to the contract."

"1.06. INSPECTION OF WORK. The Engineer and his representative shall at all times have access to the work wherever it is in preparation or progress and the Contractor shall provide proper facilities for such access and for inspection."

"2.04 ENGINEER. Wherever the term "Engineer" is used in these Specifications or Contract Documents, such terms shall be understood to mean the A. M. Byers Company (Owner), or its duly authorized representatives."

"3.02 TRENCH EXCAVATION. Banks of trenches shall be vertical * * * The Contractor shall do all bracing, sheathing, and shoring necessary to perform and protect all excavations, as required for safety, as directed by the Engineer, or to conform to governing laws."

The evidence was as called for in the contract, that a ditch 20 feet in depth and 5 feet in width with vertical sides was being dug at the time of the accident. Specifically, the contractor was to do the bracing and shoring " * * * to protect the excavation as required by safety * * * or to conform to governing laws." The Engineer in turn could direct the contractor and enforce the Section 3.02 provisions. The expert witness

called by plaintiff, one Frank W. Miller, was a man of long experience in heavy industry. He examined the collapsed trench within minutes after the accident. He testified that the sheeting which was used was too short for the size of the trench. And further, he also stated that the timbers used for bracing purposes should have been six by six inches or eight by eight inches, rather than four by four inches. In the Rules and Regulations for Trenches and Excavations of the Pennsylvania Department of Labor and Industry, under the Section pertaining to specifications of trenches, Rule 3 is styled "Unstable Material". In speaking of cross braces this Rule refers to Rule 2(c) in which the requirement of the size of timbers is four by six inches rather than four by four inches as used on the Byers job. Thus a factual situation was presented wherein the failure of the Engineer to exercise the control vested in him under the contract was the area in which the jury could, under the evidence, find negligence. It is believed that the jury's verdict established liability under the evidence with the application of the law as found in Section 414 of the Restatement.

DEFENDANT'S CONTENTION THAT IT WAS ERROR TO PERMIT THE JURY TO HAVE THE CONTRACT DURING THEIR DELIBERATIONS.

█ The pretrial conference in this case was held before Judge Miller on July 11, 1961. Prior thereto, counsel for the parties stipulated as to certain Exhibits. Paragraph IV, No. 3., covered the contract in the instant case. It reads:

"3. There was in existence a certain contract between defendant and A.C.I., Inc., dated November 10, 1958. The said contract will be admitted in to evidence, the terms of which are clearly stated;"

At the pretrial conference Judge Miller referred to plaintiff's exhibits and the stipulation. The trial record shows that both sides agreed that the contract should go into evidence. At the trial it was ad-mitted without objection. Mr. Harrington for the plaintiff, read to the jury certain portions of it. Mr. Burns, for the defendant, also read portions of it. When Mr. Burns opened his case he said, inter alia, (Trans. p. 189):

"MR. BURNS: Now, if your Honor please, under the pretrial agreement the contract in toto was to be offered in evidence.

"THE COURT: Yes, it is in evidence."

After making the foregoing statement Mr. Burns did mention that perhaps certain portions of the contract were unnecessary for the jury's consideration and there then was some colloquy with the trial judge on the subject. He did not call my attention, however, to any paragraph which he wished deleted or not presented to the jury. The purport of his remarks were that certain portions were not helpful in the decision of the case. He then read certain portions to the jury of the contract that had been admitted by plaintiff's counsel, which included the following words: (Trans. p. 193):

"Paragraph C. That should this proposal, including additions, the deductions or omissions indicated or authorized by the schedules of unit prices, be accepted by the A. M. Byers Company, he will execute the contract and furnish properly executed, such bonds and insurance certificates within the time and in the form and amount as may be required by the contract or specifications."

It is, of course, true, that during the trial neither counsel read the paragraph which defendant now says the jury should not have seen. There is a paragraph in the contract which required Allegheny Contracting Industries, Inc., the contractor, to furnish A. M. Byers with a policy of insurance covering its possible liability to any one injured or killed in the course of the work as follows:

"The limits of liability provided in such liability insurance policies shall

not be less than $100,000 for injuries, including the accidental death, to any one person and not less than $300,000 for any one accident."

It should be emphasized at this point that had defendant's able and experienced counsel requested it, the provision as to liability insurance could have been deleted from the contract prior to its admission into evidence. Such deletion could easily have been accomplished by covering up that paragraph or excising it from the typewritten page. But throughout the trial, until the very end, no reference to that paragraph had been made by either counsel or the court. It was not called to my attention as trial judge, and, I am frank to say, I did not notice it until Mr. Burns objected to that provision going out with the jury. His objection did not come until after the charge had been made. I carefully told the jury in the charge that the contract was available for them and that they could read it and construe its provisions in determining whether or not Byers had retained the control mentioned in Section 414 of the Restatement. There was a rather lengthy side bar discussion on what should be done prior to the jury's retiring for its deliberation. A decision then had to be made whether the insurance provision in the contract was prejudicial to the defendant in the sense advanced by defendant's counsel. Almost continuous reference had been made to the contract by both counsel throughout the trial. Plaintiff's contention was before the jury and defendant strenuously argued to the jury that the contract provisions left responsibility solely with Allegheny, and thus relieved Byers of any liability for negligence. The contract was the key point in the case. Under the circumstances, I felt that it would be treating the jury in rather childlike fashion to, at the very end of the case, withdraw a portion of it from their consideration after instructing them in their deliberations to examine the whole contract, which had been received in evidence without any objection whatsoever from defendant's counsel. The Court believes that the matter was one in which I, as trial judge, had considerable discretion because of the lack of timeliness of the objection. In my opinion, the error, if any, was harmless.

## DEFENDANT'S CONTENTION THAT THE VERDICT WAS EXCESSIVE.

The case presented is one which might be styled the classical case of a young energetic son supporting his widowed mother. Unquestionably the jury was sympathetic towards the decedent's mother because of the violent and untimely death of the boy, but, nevertheless, the verdicts rested upon substantial evidence as to damages. The evidence showed that the decedent had been practically the sole support of his widowed mother and younger sister. Although but 23 years of age at the time he was killed, he had a history of regular employment and gainful earnings. He was a young man of considerable promise although he was still but a semi-skilled laborer. The record shows that he had increased his earnings in each year since he had graduated from high school. In each job change he bettered himself. The last full year he worked, that is 1958, he earned a gross of $4,294.44. The mother testified that decedent gave her $76.00 per week. She banked the money and gave him back what he needed. The mother herself was employed in a supermarket at wages of approximately $40.00 per week. From the boy's contributions and the mother's earnings, the three of them lived rather comfortably. The mother was interrogated at considerable length by plaintiff's and defendant's counsel on the amount of the contributions which inured to her own personal benefit. The jury, of course, had all this evidence to consider in awarding damages to the mother under the Wrongful Death Act. The mother's age was not stated but from the evidence as to her marriage and the purchase of her house, as well as the birth of the son and her general appearance, she

was a woman of approximately 50 years of age at the time of trial.

## SURVIVAL ACT VERDICT.

■ This award in the sum of $45,000.00 is believed supported by adequate evidence. The jury was instructed in accordance with the applicable Pennsylvania law. It was directed to ascertain what the earnings of the deceased would have been during the period of his life expectancy and deduct from them the probable cost of his own maintenance and to reduce the amount to its present worth. In that connection, of course, it was instructed that any amount awarded to the mother under the Wrongful Death Act was to be deducted from the Survival Act award. The instruction was in accord with the principles found in Murray, Adm'r v. Philadelphia Transportation Co., 359 Pa. 69, 58 A.2d 323 (1948), and subsequent cases, as well as the Pennsylvania Law Encyclopedia, Vol. 11, p. 581. The boy's life expectancy was 49.9 years. The jury award of $45,000.00 in this branch of the case does not seem unreasonable. In considering this item of damage there is a wide range for the jury to make a determination. This young man had demonstrated that he possessed earning power and the will to work. He was in good health. A jury heard the same evidence as the Court did and there is no way for the Court to say that the jury's verdict was wrong as to the award under the Survival Act.

## WRONGFUL DEATH ACT.

■■ What has been said with reference to the conclusiveness of the jury verdict in the Survival Act phase of the case cannot apply to the award under the Wrongful Death Act. Damages under this act are to be more precisely computed. The rule is, of course, under the Pennsylvania decisions, that the mother is entitled to damages for the destruction of the pecuniary benefit which she had been receiving from her son. In this case the evidence showed that the contributions to the mother from the son were substantial. Nevertheless, they cannot be correctly computed and reach the figure found by the jury. As indicated, the boy gave the mother $76.00 per week. From her own earnings and the contributions, three people lived. The mother was unable to separate the cost of the sister's support. However, this child was young and no doubt the jury could find that her benefits were received largely from the mother. It does not seem, however, under the evidence, that the mother can claim that she received over $2,800.00 per year from the son's wages. More than likely it was somewhat less. At 50 years of age her life expectancy was 27.5 years. The mother is held to the actual pecuniary loss suffered by her. On the other hand, considering the boy's age and his increased earnings, the contributions may have been increased or higher in amount over the years. There is, therefore, some area of inexactness in attempting to arrive at a reasonable figure under the evidence. The present worth of contributions of $2,500.00 per year for 27.5 years computed at 4% interest is $39,125.00. At 6% interest the amount would be smaller. The Supreme Court of the United States has indicated that the interest rate to be applied is that which persons without financial skill could safely secure on their own investments. See Chesapeake & Ohio Ry. v. Kelly, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117.

■■ In the instant case the jury could have found that the mother's loss of contributions from the date of death to the date of trial amounted to the sum of $8,000.00. This sum, of course, is not to be reduced. In addition the funeral expenses which would be included in this verdict are in the sum of $1,305.00. Thus the jury had the sum of $9,305.00, which is not subject to being reduced under the present worth principle. Deducting this sum from the award of $104,805.00 leaves a balance of $95,500.00. This sum is too high under any method of computation and cannot be permitted to stand. It seems to the Court that, having in mind all the evidence and giving the mother the benefit

of generosity, the most that can be allowed her is a verdict not in excess of $50,-000.00.

 Finally then, as to liability, the verdict is supported by substantial credible evidence and should be permitted to stand. Likewise, the Survival Act verdict of $45,000.00. A new trial will be awarded on damages under the Wrongful Death Act unless a remittitur is filed remitting all sums in excess of $50,-000.00.