STATE OF MARYLAND for the Use of Nadine Y. LEVIN, individually and as next friend, mother and guardian, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

STATE OF MARYLAND for the Use of Sydney L. JOHNS and Kennedy Smith, as Executor of the Estate of Ruth Johns, Deceased, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. Nos. 17503, 17541.

United States District Court
W. D. Pennsylvania.

Dec. 20, 1961.

Theodore E. Wolcott, New York City, William Friedman and Kennedy Smith, Pittsburgh, Pa., for plaintiffs.

Joseph S. Ammerman, U. S. Atty., Pittsburgh, Pa., Enoch E. Ellison, Sp.

Litigation Counsel, Alice K. Helm, Dept. of Justice, Washington, D. C., for United States.

GOURLEY, Chief Judge.

In this non-jury proceeding under the Federal Tort Claims Act based upon two death actions arising from a mid-air collision between a Capital commercial airliner and a T-33 jet plane owned by the United States of America, the court is confronted with three issues requiring determination:

1. Was Captain Julius R. McCoy, pilot of the T-33 jet plane, an employee of the United States acting in the scope of his employment within the purview of the Federal Tort Claims Act at the time of the accident?

2. Was Captain Julius R. McCoy guilty of negligence which was a substantial factor in bringing about the accident?

3. What damages were sustained?

Upon evaluation of all the testimony, oral and documentary, and the inferences deducible therefrom the court enters the following Findings of Fact and Conclusions of Law:

### Finding of Fact.

**Part I—Agency of Captain McCoy in Operation of the Jet T-33 Aircraft.**

1. The actions arise out of a mid-air collision between a Capital Airlines Viscount Commercial Air Transport aircraft and a T-33 Jet aircraft owned by the United States and allocated to the Maryland Air National Guard. The collision occurred on May 20, 1958, approximately four miles east-northeast of Brunswick over the State of Maryland, at an altitude of about 8,000 feet on a civil airway known as Victor 44 while the Viscount was enroute from Pittsburgh to Baltimore—Friendship Airport. The T-33 jet aircraft was being operated by Captain Julius R. McCoy on a local area flight originating out of Martin Airport, Baltimore, Maryland, and was operating under visual flight rules.

2. These two cases are brought under the Federal Tort Claims Act against the United States of America and have been consolidated for trial in this court.

3. The airplane operated by Captain McCoy at the time of the accident belonged to the United States and had been allocated to the Maryland Air National Guard. The United States paid the cost of the fuel used by the airplane on all of its flights, provided equipment, paid the salaries of all civilian and military personnel to maintain said equipment, provided new and spare parts for the equipment and made all major repairs needed by said plane and the other planes allocated to the Guard Unit.

4. On the date of the accident Captain Julius R. McCoy was employed as a full time civilian air technician under the provisions of 32 U.S.C.A. § 709(a) which provides for civilian caretakers of United States Military Property.[1] He was also a commissioned officer in the Air National Guard of the State of Maryland.

5. Pursuant to 32 U.S.C.A. § 709(a) and under the direction of the Secretary of the Air Force there was promulgated a "Civilian Personnel Manual," dated December 20, 1954, (hereinafter referred to as ANGM 40–01) which listed the jobs in the air technician categories and prescribed the duties and requirements of the jobs and the prerequisite training for such employment. This also contained a job description of aircraft maintenance chief and aircraft maintenance supervisor.

---

1. 32 U.S.C.A. § 709(a) provides:

"* * * Under such regulations as the Secretary of the Air Force may prescribe, funds allotted by him for the Air National Guard may be spent for the compensation of competent persons to care for material, armament, and equipment of the Air National Guard. A caretaker employed under this subsection may also perform clerical duties incidental to his employment and other duties that do not interfere with the performance of his duties as caretaker."

6. Under the authority of ANGM 40–01, the National Guard Bureau promulgated Air National Guard Manual 40–01 dated 1 March 1958, (hereinafter referred to as ANGM 40–01) which provides that its provisions will govern all Air National Guard civilian employees. Said manual further provides that the "authority of the National Guard Bureau to regulate employment and rates of compensation is contained in Department of the Army General Order 96, dated 9 November 1951, subject, 'Delegation of Authority for the Employment and Fixing of Salaries for all Caretakers and Clerks in the National Guard Bureau.' "

7. Air technicians such as Captain McCoy are full time civilian personnel who are placed at National Guard installations to maintain federal property and records, to the prescribed standard of the United States Air Force, that cannot be maintained by the normal personnel assigned to the Guard Units. In order to qualify as an air technician (caretaker) under provisions of ANGM 40–01, Captain McCoy attended a nine months' course for Maintenance Officers at the United States Air Force Base and Maintenance School at Chanute Air Force Base, Illinois. He was ordered to active duty and required to attend the school at Chanute by authority of the Secretary of the Air Force. While attending this school, he was paid by the United States Air Force Finance Office at Chanute.

8. As an air technician (caretaker), Captain McCoy held a job entitled Aircraft Maintenance Chief. This job required him to see that 28 aircraft belonging to the United States were properly maintained in accordance with Air Force regulations and to supervise approximately 60 to 65 persons at the Base working on the maintenance and care of these airplanes owned by the United States.

9. Aircraft maintenance procedures are set by the United States Air Force and the responsibilities of Aircraft Maintenance Chiefs are outlined by United States Air Force regulations, manuals, and technical orders. To insure that the unit operated the equipment in accordance with standards prescribed by the United States Air Force, an Air Force Adviser who was on active duty with the United States Air Force was stationed at Martin Field. If he were dissatisfied with the maintenance situation, he would so report to the Air Force.

10. United States Air Force Inspection Teams made inspections to determine whether the Air Technicians were complying with the requirements of ANGM 40–01. These inspections were made annually to determine whether the technicians were qualified to continue to hold their jobs. If the United States found that a civilian employee of an Air National Guard Unit was not meeting the requirements, it could, in practical effect, work his discharge by stopping his salary.

11. At the time of the occurrence, in addition to his duties as Aircraft Maintenance Chief, Captain McCoy was Acting Maintenance Supervisor for the Base in the absence of Major Mitchell who held this assignment but who was away on a training program. (Prior to May 16, 1958, Captain McCoy had been Maintenance Supervisor but his job status was changed effective that date to Aircraft Maintenance Chief.) At the time of the occurrence, Captain McCoy was the only officer in the aircraft maintenance field at the Base.

12. As Acting Maintenance Supervisor, Captain McCoy had approximately 60 to 65 civilian maintenance personnel under his supervision. The duties of this job included supervision of the maintenance and care of aircraft, vehicles, ground support equipment, all United States property at the Base, and also over-all supervision of the people who maintained the equipment.

13. As an air technician, i. e. in his civilian capacity, Captain McCoy was employed at the Base during the normal work week from 8:00 A.M. to 4:30 P.M., Tuesday through Saturday, except for two Saturdays a month. On those two

Saturdays, he would be in his military status as an officer in the Air National Guard and as Squadron Maintenance Officer. The accident occurred on a Tuesday, when Captain McCoy worked in his civilian capacity as an air technician in accordance with the usual practice and procedure at the Base.

14. Captain McCoy's immediate superior in his civilian employee status was Lt. Col. Kilkowski, who was also, in addition to his military status as a member of the Maryland Air National Guard in which he was commanding officer of the Squadron, a civilian employee holding the air technician position of Base Detachment Commander.

15. Captain McCoy applied to Lt. Col. Kilkowski for permission, and received it, to make the flight on May 20, 1958, accompanied by a passenger, Donald Chalmers, who was a member of the Maryland Army National Guard. Captain McCoy informed Lt. Col. Kilkowski that the purpose of the flight was a proficiency flight, and the flight clearance and order issued in connection with the flight indicate that the purpose of the flight was proficiency.

16. In order to maintain his aeronautical rating as a pilot, it was necessary that Captain McCoy perform proficiency flights to comply with the requirements of AFR 60-2 [2] which prescribes certain minimum flying requirements for maintenance of a rating as a flying officer.

17. An aeronautical rating only allows a man to fly the aircraft, if he obtains permission to do so. It does not determine his purpose or the work he is properly doing in flying that aircraft.

18. While the job description of the Aircraft Maintenance Chief's position set forth in Civilian Personnel Manual ANGM 40-01 contains no requirement that the holder of the position be a pilot or that he fly aircraft, the job description for Base Maintenance Supervisor provides that it is "desirable" that the

incumbent be a rated pilot on flying status to enable him to "make test flights on assigned aircraft."

19. It is desirable for the Maintenance Officer to have a flying status for various reasons. For example, when he flies the aircraft, he observes under operating conditions the quality of the maintenance being performed thereon as well as the condition of the equipment, all of which is necessary to and part of the efficient performance of his job as air technician and caretaker of United States property.

20. Captain McCoy's status as Acting Maintenance Supervisor and Aircraft Maintenance Chief for the Base made it desirable for him to make frequent aerial flights. This was an important part of his work in maintenance of the aircraft. As an air technician Aircraft Maintenance Officer, one reason for this flight or any flight that he engaged in was to insure the proper maintenance of the equipment over which he had general supervision. While flying he could also see and check the cleanliness of his runways, parking and service areas (ramps), see the condition of the airport, check the efficiency of the tower personnel and the way his maintenance people reacted. In short, whenever he flew he could get a better appreciation of the way the maintenance (caretaker) people under his supervision were doing their job. It was also part of Captain McCoy's duties in his air technician civilian job to fly functional check flights. Therefore, since he had to maintain proficiency as a pilot in order to be qualified and competent to perform these flights, even flying for proficiency related to Captain McCoy's civilian job.

21. During the course of the flight Captain McCoy checked the efficiency of the T-33 jet and its equipment in order to determine if it were working properly and if the maintenance thereon had been properly performed.

22. The particular flight at the time of the accident was part of Captain Mc-

---

2. The reference to AFR 60-2 pertains to Air Force Regulation No. 60-2 dated 14 March 1955.

Coy's function to maintain proficiency and maintain the equipment of the United States as a civilian air technician (caretaker).

23. Captain McCoy in his full time air technician (caretaker) job was paid by check drawn on the Treasury of the United States. His annual salary was $7,500 per annum. He was also paid approximately $2,000 per annum by the Treasurer of the United States for his part-time military duties.

24. While it was necessary for Captain McCoy to have a military pilot's rating in order to fly a United States military plane, his work in flying such plane could involve performance in a dual (military and civilian) capacity. However, he could only occupy one *pay* status at a time. He could occupy his pay status as a civilian caretaker in maintenance work or he could occupy his pay status as an air National Guardsman in a military capacity.

25. In addition to the civil or military pay status he could receive or earn extra flight pay for flying in any month. In May 1958, at the time of the accident, Captain McCoy had accumulated more than the number of hours for which he could earn flight pay for the period in question. His flight on the occasion in question therefore was not to earn flight pay.

26. On the morning in question, Tuesday, May 20, 1958, Captain McCoy reported to the Base and commenced work, at the usual starting time, on his full time civilian caretaker job as an air technician in the position of Aircraft Maintenance Chief. That day he was also the Acting Maintenance Supervisor in Major Mitchell's absence. Before the flight he performed certain administrative duties required every day to establish the order of business for the day; that included the determination of which aircraft would be maintained and gotten ready for flight or repair, if necessary, and the work assignments of various individuals. At the time of the occur-

rence, he was recorded as present at the Base in his civilian capacity. He was carried on the roster in his air technician caretaker pay status and was ultimately paid by the United States Treasurer in this capacity.

27. Following the accident, because of his injuries, Captain McCoy was unable to continue with his work and his status was changed on the roll at the Base on that same day from "active duty" as civilian air technician to an "inactive" or "sick" status as civilian air technician.

28. The passenger who rode with Captain McCoy, Donald A. Chalmers, was required to sign a release prior to the flight releasing the United States and the State of Maryland from any liability on account of Chalmers' injury or death due to the flight.

29. Following the accident, application was made by Captain McCoy for benefits (medical care and treatment of the injuries suffered) under the Federal Employees' Compensation Act.[3]

30. Captain McCoy was entitled to medical care and treatment under the Federal Employees' Compensation Act only if he were injured in his capacity as a federal employee (air technician working in civilian status as maintenance officer of United States Government property) while in the performance of his duty. He was not entitled to any benefits under that Act if he were injured while working in his military capacity in the Air National Guard, since different benefits were provided by another statute (32 U.S.C.A. § 319) for injuries occurring to a guardsman while acting in a military capacity.

31. Lt. Col. Kilkowski, the Base Detachment Commander, (Air Technician) approved the application of Captain McCoy for medical and hospital benefits under the aforesaid Federal Employees' Compensation Act.

32. Thereafter, Colonel Ebaugh, United States Property and Fiscal Officer for the State of Maryland, on active

3. 5 U.S.C.A. § 751 et seq.

duty in the service of the United States, employed by the National Guard Bureau, a federal agency, working directly under General Wilson, Deputy Chief of the Bureau, approved the claim, stating that Captain McCoy was injured in the course of his employment as a "civil employee of the United States and *not* as a member of the Maryland National Guard."

33. The United States Department of Labor, through Stuart Rothman, its solicitor by one Mr. Wright, Chief of its Subrogation Branch, and by a claims supervisor for the Bureau of Employees' Compensation, United States Department of Labor, John Stasko, and by John M. Diggins, a claims examiner of the same department, in the usual course of business:

(a) Approved the claim and authorized the payment of benefits under the Federal Employees' Compensation Act for Captain McCoy as a federal civilian employee injured in the performance of his duties;

(b) Paid such benefits;

(c) Prepared and had Captain McCoy execute a written assignment to the United States of subrogation rights to recover from Capital Airlines and against any other parties than the United States the amount of benefits paid for Captain McCoy by the United States under the Federal Employees' Compensation Act. This assignment stated that Captain McCoy was injured "while employed as Aircraft Maintenance Chief (pilot) by the Department of the Air Force."

34. In operating the airplane at the time of the occurrence, Captain McCoy was carrying out his civilian work as Aircraft Maintenance Chief and Acting Maintenance Supervisor of the Base, and therefore, was a civil employee of the United States acting within the scope of his employment.

Part II—Negligence of Captain McCoy While Acting as an Agent of the United States of America.

35. The collision occurred in clear and unobstructed skies on May 20, 1958, at about 11:27 A.M., Eastern Daylight Time, while the Viscount was enroute under Instrument Flight Rules from Pittsburgh to Baltimore—Friendship Airport. The T-33 jet plane was being operated by Captain Julius R. McCoy, an employee of the United States, in the course and scope of his employment, on a local area flight out of Martin Airport, Baltimore, Maryland, and was operating under Visual Flight Rules. Both aircrafts were operating subject to the Civil Air Regulations of the United States.

36. Prior to the accident the Capital Airlines plane was observed by a number of witnesses who testified that prior to and including the moment of the collision with the T-33 Jet the Capital Airline's Viscount was proceeding straight ahead on an easterly course in level flight and did not change its course up or down or to the left or to the right.

37. The same witnesses also testified that the T-33 Jet operated by Captain Julius R. McCoy was also traveling in an easterly direction and at a faster rate of speed than the Capital plane; that it approached and overtook the Capital plane after being observed on an approximately parallel course which was a distance of approximately one mile or more north of the Capital Viscount and that the T-33 Jet then made a turn toward the right as it was approaching the Capital plane, approached it obliquely from the left and initially struck the Capital plane in its forward nosesection; that the T-33 jet struck the Viscount under conditions of clear visibility.

38. The T-33 Jet initially struck the Capital plane with its right tip-tank, a fuel tank located and attached to the tip and outer end of the right wing.

39. Following the initial impact the Jet aircraft then rolled over the top of the Capital Viscount and exploded in the air.

40. Following the impact, the Capital Viscount continued ahead for a short distance, and then commenced to slowly spiral down to the ground in a relatively level altitude and intact condition with

no apparent inflight damage to its cabin section. The Viscount struck the ground after the passage of an appreciable interval of time from the moment of collision. Upon striking the ground, the Viscount broke up and was destroyed and all on board were killed.

41. The pilot of the T–33 Jet was ejected from his aircraft during the course of the accident, and opened his parachute. He was the only survivor of the accident. The single passenger in the T–33 jet died in the accident.

42. The pilot of the T–33 Jet, Captain Julius R. McCoy in the operation of his airplane, and in colliding with the Capital Viscount, was negligent and careless in the operation of his plane, and in addition, violated each of the following Civil Air Regulations:

#60.10. *Application.* Aircraft shall be operated at all times in compliance with the following general flight rules and also in compliance with either the visual flight rules or the instrument flight rules whichever are applicable.

#60.12. *Careless or reckless operation.* No person shall operate an aircraft in a careless or reckless manner so as to endanger the life or property of others.

(c) Lack of vigilance by the pilot to observe and avoid other air traffic. In this respect, the pilot must clear his position prior to starting any maneuver, either on the ground or in flight.

(d) Passing other aircraft too closely.

#60.15. *Proximity of aircraft.* No person shall operate an aircraft in such proximity to other aircraft as to create a collision hazard.

43. The pilot of the T–33 jet failed to maintain adequate vigilance although he had clear visibility and sufficient range of vision. He also negligently failed to avoid the Viscount and to take appropriate evasive action.

44. The proximate cause of the accident was the negligence and wrongful conduct of the employee of the defendant, the United States of America, Captain Julius R. McCoy.

Part III. Damages Sustained.

A. The Action for the Death of Jack Levin.

45. Jack Levin was employed as Vice President in charge of Sales and Merchandising by Swift Homes, Inc., on and prior to May 20, 1958.

46. On and prior to May 20, 1958, he was the husband of Nadine Y. Levin and father of Joy Ellen Levin, child of the marriage.

47. That Jack Levin was born on January 4, 1918, and died in the accident on May 20, 1958.

48. That he left him surviving as a dependent next of kin his aforesaid widow and child.

49. That Nadine Y. Levin, the widow, was born May 1, 1924; that Joy Ellen Levin, the daughter, was born September 28, 1955.

50. That the said widow and child of Jack Levin were wholly dependent on him for maintenance and support and each of them has suffered pecuniary loss by reason of his death; that in addition his child has suffered the loss of guidance, comfort, education, companionship and the widow has suffered the loss of comfort, companionship, care and affection, and loss of consortium.

51. That at the time of the death of Jack Levin, his expectancy of life based upon the United States Abridged Life Tables was 31.6 years; the expectancy of life of his widow according to the said table on said date was 41.4 years, that the stipulated joint expectancy of life of Jack Levin and Nadine Y. Levin, his widow, on May 20, 1958 was 29 years, that the years from her age at the time of death of Jack Levin until Joy Ellen Levin would become twenty-one years of age was 18⅓ years; that Jack Levin and his wife and child were in excellent health at the time of his death.

52. While employed by Swift Homes, Inc., Jack Levin's annual earnings were as follows: 1954—$53,737.16; 1955—$56,409.28; 1956—$60,587.26; 1957—$58,235.05; for the first 4⅔ months of

1958 to the date of death—$24,070.20, that had he continued in the employ of said Company there were reasonable prospects for substantial increases in his earnings; and Jack Levin having realized increased annual benefits from the profit sharing plan up to the date of his death and had he not been killed in this accident he would have realized additional substantial benefits from this plan as well as other side benefits by way of health insurance, premium for life insurance from which we may establish an approximate average earnings of $60,000 a year.

53. That at the time of death and for several years prior thereto, approximately ⅔'s of the earnings of the said Jack Levin was being used for the support, care, maintenance of his wife and child, that approximately ⅓ of his said earnings was being used for the maintenance and support of Nadine Y. Levin, his wife, and ⅓ of his said earnings was being used for the support, care, education and maintenance of his minor child, Joy Ellen Levin; that after payment of taxes on the aforementioned earnings, and after payment by decedent for support of his mother the approximate sum of $4,000 per year, there remained approximately $36,000 per year which, according to the foregoing percentages, was expended entirely for the support of Jack Levin and his family of which ⅔'s was used for their support, care and maintenance; that approximately ⅓ of $12,000 out of his said earnings was being used for the maintenance and support of Nadine Y. Levin, his wife, and approximately ⅓ or $12,000 of his said earnings was being used for the support, care, maintenance and education of Joy Ellen Levin, his minor child; and these contributions would have continued until the minor child would attain the age of twenty-one, at which time a portion of the earnings which had been used for such child would be added to the share of earnings used by the said widow, Nadine Y. Levin; thereafter the contributions for the care, maintenance and support of the wife would have continued on the basis of ½

of the net earnings after taxes or $18,000 per year for the balance of the joint life expectancy, or an additional eleven years.

54. That by reason of the death of Jack Levin, Nadine Y. Levin, his widow, suffered and will suffer pecuniary loss and damages, including loss of society, care, comfort and companionship, and the present cash value of said pecuniary loss and damages reduced to present worth is $245,000.

55. That by reason of the death of Jack Levin, his child, Joy Ellen Levin, suffered and will suffer pecuniary loss and damages to twenty-one years of age including guidance, care, loss of society, care and comfort, and the present cash value of said pecuniary loss and damages suffered by said child as a result of the death of her father reduced to present worth is $100,000.

56. That by reason of the premises, the said Jack Levin experienced conscious pain and suffering from the moment of collision impact until the time of his death after the Viscount aircraft struck the ground; that by reason thereof, Mellon National Bank and Trust Company, the Executor of the Estate of Jack Levin, shall recover from the defendant as follows:

(a) For the conscious pain and suffering of Jack Levin the sum of $5,000.

(b) For stipulated funeral expenses the sum of $1,000.

B. The Action for the Death of Ruth M. Johns.

57. That Ruth M. Johns on and prior to May 20, 1958, was the wife of Sydney L. Johns.

58. That Ruth M. Johns and Sydney L. Johns were married September 16, 1933, and resided together continuously as husband and wife until the date of death of Ruth M. Johns.

59. That Ruth M. Johns was born on March 24, 1911, and died in the accident on May 20, 1958, and left her surviving her husband, Sydney L. Johns, that there were no children of said marriage.

60. That Sydney L. Johns, the widower, was born January 4, 1908, and was duly licensed to engage in the practice of medicine in the State of Pennsylvania and practiced in said state from on or about September 30, 1931. Ruth M. Johns and Sydney L. Johns resided together in their own private house in the City of Pittsburgh and that a section of said house was utilized by Sydney L. Johns as an office for the practice of his profession.

61. That since 1941 and until the date of her death, Ruth M. Johns was employed by Sydney L. Johns and rendered services to him as an office manager and medical assistant in connection with his practice of medicine and that her duties included answering telephones, taking messages, receptionist, making appointments, keeping records, bookkeeping, billing, assisting in the handling, soothing and calming of patients, care and maintenance of the office and equipment, being present while women patients were being treated and generally useful in the duties of an office manager and medical assistant.

62. That Dr. Sydney L. Johns maintained office hours at least five days a week and that Ruth M. Johns rendered services as an office manager and medical assistant at least forty hours a week in addition to her services as a housewife and marriage partner of Sydney L. Johns.

63. That the fair and reasonable value of the services rendered by Ruth M. Johns to Sydney L. Johns as of the time of her death was $320.00 per month.

64. That in addition to the aforesaid services there existed a relationship of mutual love, affection and devotion between Ruth and Sydney Johns, that they were also dependent upon each other for guidance and companionship and that Ruth Johns also faithfully performed the duties of a housewife in maintaining and keeping the home of Sydney Johns.

65. That Sydney L. Johns by reason of the death of Ruth M. Johns also suffered loss of consortium, care, affection, love and companionship.

66. That by reason of the death of Ruth M. Johns, Sydney L. Johns suffered the loss of her services as his office manager and medical assistant; that his gross income for several years prior to her death was approximately $9,000 annually and dropped in the year following her death to $3,312.

67. That at the time of death of Ruth M. Johns, her expectancy of life according to the United States Life Tables was 29.36 years; the life expectancy of her widower, Sydney L. Johns, according to the said tables on said date was 22.83 years; that the stipulated joint expectancy of life of Ruth M. Johns and of Sydney L. Johns, her widower, on May 20, 1958, was 20 years.

68. That except for a minor impairment of motion of her neck, Ruth M. Johns was in excellent health at the time of her death; that there was no evidence that this impairment of motion limited in any way her life expectancy; that the health of Dr. Sydney L. Johns at the time of the death of Ruth M. Johns was excellent; that the mother of Ruth M. Johns is still alive at the age of eighty-three and her father is still alive at the age of eighty-seven and that her grandmother died at the age of ninety-one; that no evidence in diminution of the aforesaid normal life expectancy of Ruth M. Johns and Sydney L. Johns was offered by the defendant or received by the court.

69. That by reason of the death of Ruth M. Johns, Sydney L. Johns, her widower, suffered and will suffer pecuniary loss and damages including loss of her society, comfort, care, love and guidance and the present cash value of said pecuniary loss and damages reduced to present worth is $70,000.

70. That by reason of the premises, the said Ruth M. Johns experienced conscious pain and suffering from the moment of collision impact until the time of her death after the Viscount aircraft struck the ground; that by reason thereof, Kennedy Smith, Executor of the Estate of Ruth M. Johns, shall recover from the defendant as follows:

(a) For the conscious pain and suffering of Ruth M. Johns the sum of $5,000.

(b) For stipulated funeral expenses the sum of $1,000.

### Conclusions of Law.

1. A person employed as an air technician (caretaker) in a non-activated National Guard unit is an employee of the United States within the meaning of the Federal Tort Claims Act.

2. Captain Julius R. McCoy at the time of the accident was an employee of the United States acting within the scope of his employment within the purview of the Federal Tort Claims Act, 28 U.S. C.A. § 1346(b).

3. The deaths and injuries suffered by the decedents and the plaintiffs herein and the damages resulting therefrom were caused by the negligence of the United States by its employee, Captain Julius R. McCoy, acting within the scope of his employment.

An appropriate Order is entered.