**In the Matter of the Complaint of CONSOLIDATION COAL COMPANY, a corporation, for exoneration from or limitation of, liability as owner of the Motor Vessel Mathies.**

**No. 67–370.**

United States District Court
W. D. Pennsylvania.

Sept. 20, 1968.

Memorandum sur Motions to Amend
March 4, 1969.

Raymond G. Hasley, of Rose, Schmidt & Dixon, Pittsburgh, Pa., for Consolidation Coal Co., petitioner.

Lawrence R. Zewe, Washington, Pa., for George L. Dearth, Admr. of Estate of Jane L. Dearth, decd., claimant.

Thomas L. Cooper, of McArdle & McLaughlin, Pittsburgh, Pa., for John

Sabo, Admr. of Estate of Alec Michael Sabo, decd., claimant.

Edwin H. Beachler, of McArdle & McLaughlin, Pittsburgh, Pa., for Edward J. Hugney, claimant.

## OPINION AND ORDER

MARSH, District Judge.

The petitioner, Consolidation Coal Company, brought this action in the Northern District of West Virginia for exoneration from or limitation of liability with respect to accidents which occurred in the Monongahela River near Lock No. 5. A monition issued and two claims were filed under the Wrongful Death and Survival statutes of Pennsylvania: one by George L. Dearth, Administrator of the Estate of Jane L. Dearth, deceased, and the other by John Sabo, Administrator of the Estate of Alec Michael Sabo, deceased; a third claim was filed under the Jones Act, admiralty and general maritime law by Edward J. Hugney, the mate on the vessel.

The proceeding was transferred to this court pursuant to § 1404(a), 28 U.S.C.A.

The petitioner averred that the value of its Motor Vessel Mathies was $130,-000. The claimants challenged this valuation. However, since the damages to which the court finds the claimants are entitled do not exceed that amount, that issue need not be tried.

The damages sustained by the claimants were directly caused by the negligence of the pilot of the Motor Vessel Mathies, for which conduct it is adjudged that the vessel and its owner, Consolidation Coal Company, are responsible, together with costs, but entitled to limitation of their liability to the value of the vessel at the time of the accident. There was insufficient evidence to establish privity of fault on the part of the shore management of the petitioner.

The case was tried non-jury. From the testimony taken it appears that in the afternoon of June 18, 1966, the Mathies, a diesel, twin-screw Western Rivers type towboat, with a crew of 13 experienced rivermen aboard and towing seven barges, was on a voyage from West Elizabeth, Allegheny County, Pennsylvania, to the Isabella Mine in Greene County, Pennsylvania. Six barges, two abreast, were ahead of the towboat, and one barge was lashed to the starboard side of the towboat.

The tow, proceeding upriver in a southerly direction, reached the arrival point for Lock and Dam No. 5 at approximately 4:00 P.M. Because the lock was in use, the pilot, Howard Cady, grounded the head of the tow at the river's edge along the West Brownsville shore, thus holding the tow stationary, to await the signal to enter the lock. The expected signal consisted of three blasts of a whistle at the lock. The Mathies and its tow were angled from the shore line out into the river; its engines continued to idle.

The arrival point for vessels sailing south toward Lock No. 5 was at the New Brownsville Bridge which was 3,000 feet from the lock (petitioner's Ex. 1).[1]

About 300 feet south of this bridge was a 50-foot wide area, cleared of stones and debris and marked by whitewashed stones, which for many years was used as a beach by bathers. A flight of steps led to this bathing beach from a road that paralleled the river.

The Mathies is 108 feet long and 26 feet, 6 inches wide. It has a draft of 7 feet, 8 inches; from the water line to its highest fixed point is 27½ feet; and from the water line to the pilot house is about 20 to 22 feet. The pilot house is 10 feet by 12 feet and is located about 18 feet from the bow. Its gross tonnage is 304 tons and its net tonnage is 206 tons. The pilot house is surrounded by glass windows. An air horn and a bell are within reach of the pilot when in position to operate the vessel.

---

1. The Lockmaster estimated the distance to be 1,500 feet (T., p. 432).

The vessel is powered by two engines that turn at 750 r.p.m. Under the vessel and located approximately 12 feet from the stern are two propellers, 6 feet in diameter. Each propeller is encased in a Kort nozzle and each nozzle has an 8-foot outside diameter and a 6-foot, 2-inch interior diameter. Two flanking rudders, each 4 feet long and 5 feet high, are located in front of each Kort nozzle. One steering rudder, 8½ feet long and 5½ feet high, is located behind each Kort nozzle.

The barges in tow were empty. Each was approximately 175 feet long, 26 feet wide, and 11 feet high. Being empty each had a draft of about 18 inches.

On the beach that afternoon were four bathers, namely, Jane L. Dearth and Alec Sabo, the decedents; Deborah Lane, called by the petitioner as a witness, and Sandra Williams, called by the claimants as a witness.

The pilot saw these four persons as he grounded the tow. The tow remained grounded for about 45 minutes. The idling engines could have been heard by the bathers if attentive.[2] During this time, the pilot saw that two of the four persons were bathing in the river between the beach and the barge lashed to the starboard side of the towboat. Several members of the Mathies' crew saw the bathers in the river. Some members of the crew conversed with the bathers in the river, and Pilot Cady himself said a few words to Sandra Williams, sunbathing on the shore. Some of the conversation between the crew and Miss Williams was relayed by Alec Sabo from his position in the river near the barge.

During this interval, the Mathies drifted closer to the West Brownsville shore, finally approaching the beach at a distance estimated by members of the crew to be from 75 to 40 feet. During this interval, Jane and Alec were wading, with a rubber raft and innertube, in the water (chest-high) near the barge. A considerable section of the water between the beach and the barge could not be seen by the pilot from the pilot house or by the members of the crew on the starboard side of the bridge. Regardless, the pilot, without receiving the signal from the lockmaster and without sounding a warning or giving notice to anyone, suddenly engaged the propellers full speed in order to "twist" the stern of the tow out into the river channel.

Before engaging the propellers, the pilot neglected to account for two of the four persons he had so recently seen on the beach and in the river; he neglected to inquire of the other members of the crew as to the whereabouts of the two unseen bathers;[3] he neglected to have the section of water between the barge and the beach, which he could not see, checked by a member of the crew. In the circumstances, the pilot knew or should have known that two of the bathers may have been in the river, out of sight between the barge and the bathing beach, and if that were the fact, it was foreseeable that the turbulence created by the action of the large propellers at full speed in the shallow water between the Mathies and the shore would quite likely cause them serious bodily harm or death.

As a direct consequence of the pilot's negligence, Jane L. Dearth and Alec Sabo were drawn underneath the barge and into a rotating propeller. At least two members of the crew, Isaac Hughes and Edward Hugney, were alert to the danger and both promptly exclaimed to the pilot, "I don't see the kids", whereupon the pilot disengaged the propellers (T., pp. 244, 360, 901–902). Immediately, Hughes, Hugney, Pilot Cady and oth-

2. This issue was in conflict: Deborah Lane, a bather, testified that she could not hear the engines; Florence Gwyn, at an open window in her house not far from the beach, said she heard them idling; that the sound was not loud but detectable.

3. Some members of the crew, on the bridge and on the barge (T., pp. 163, 358, 375, 384), were talking to the decedents a short time before the pilot engaged the propellers (T., pp. 131, 477–478).

er crew members hurried to the starboard gunnel of the barge and looked over, searching for the children. Captain Frazier, who was in the pilot house at the time, took the controls and upon hearing from Hughes that "the kids are under the barge" and to "give her a poke ahead to wash them out", compounded the pilot's negligence by reengaging the propellers. This dangerous procedure may have pulled the children into the propellers if they had not already been drawn into them. In less than half a minute after the propellers were reengaged, the bodies of the children appeared on the surface near the stern of the barge (T., pp. 248–251, 294, 363–364).[4] When both were recovered, they were dead. Alec sustained a complete severance of the right leg above the ankle and severe lacerations of the left leg, right arm, groin, face and other parts of his body; Jane sustained severe lacerations of the pelvic region and head; both died from hemorrhage (Sabo Exs. 11, 12, 20, 22; Dearth Ex. 4).

■ The pilot had a duty imposed by the law to avoid causing harm to these bathers. "It is a primary *social* duty of every person to take thought and have a care lest his action [or omission to act] result in injuries to others. This social duty *the law* recognizes and enforces, and for any injury resulting from any person's lack of elementary forethought, the law holds that person accountable." (Emphasis in original.) Bisson v. John B. Kelly, Inc., 314 Pa. 99, 170 A. 139, 143 (1934). See also, McNello v. John B. Kelly, Inc., 283 F.2d 96, 100 (3d Cir. 1960); Potere v. City of Philadelphia, 380 Pa. 581, 587, 112 A.2d 100, 103–104 (1955).

■ We cannot accept petitioner's argument that the pilot was not required by statute, regulation or custom to place a lookout on the barge lashed to the starboard side of the towboat, or to sound the boat's horn, ring its bell or otherwise signal to give notice of its departure.

As stated in Texas & Pacific Ry. Co. v. Behymer, 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903):

"What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not."

In MacDougall v. Pennsylvania Power & Light Co., 311 Pa. 387, 166 A. 589, 593 (1933), the Court said:

"* * * [A] person while he may take counsel of custom should also take counsel of his common sense and of his judgment. In the long run usage must conform to reason."

In The T. J. Hooper, 60 F.2d 737, 740 (2d Cir.1932), an admiralty case, Judge Hand stated:

"* * * [A] whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission."

See also, Potere v. City of Philadelphia, *supra*, 112 A.2d p. 103.

The negligence of the pilot was the proximate cause of the deaths of the decedents.

■ The decedents were not contributorily negligent nor did they assume the risk as petitioner so strenuously contends. They had lived near the river all their lives and bathed in it since childhood. They had observed the towboats

---

4. Captain Frazier, realizing the danger and perhaps to exonerate himself from fault, denied that he intended to wash out the bodies from under the barge, and testified that he did not reengage the propellers until he saw the bodies come up from under the boat (T., pp. 405, 410–411). We do not accept this testimony as credible. It cannot be known whether the bodies of the children came into contact with the propellers immediately following Pilot Cady's negligence or following Captain Frazier's negligence.

ground their tows on one shore or the other and await the signal from the lockmaster to enter the lock. They must have known that on occasion the tows were delayed for hours and that it was customary that the diesel engines in the waiting vessels continued to idle. They would be held to know that being in the river was hazardous when the propellers of a towboat were operating and creating turbulence in shallow water. They went to the shore when the towboat pulled in (T., pp. 233, 356). However, they could rest assured that there was no danger in wading in the river during the period when the tow was stationary especially when they knew that their presence there during that interval was known to members of the crew with whom they had so recently conversed. They were entitled to expect that some notice or warning would have been given before the propellers were engaged. No signal from the lock had preceded the starting of the propellers; no warning of any kind was given them that the propellers were about to churn the water.

The court concludes that the decedents exercised reasonable and ordinary care in the circumstances. They were familiar with the hazards of bathing at this beach while towboats were maneuvering close to shore; but during the period when the Mathies and its tow were grounded, they were not deliberately courting almost certain mutilation or death. As petitioner's witness, Miss Lane, testified, bathers stayed out of the water "unless it [the towboat] was there for a long time." (T., p. 123.) The presumption that they were exercising due care was not overcome by the evidence. Neither can be held to have expected that the pilot who they justifiably could believe was aware of their presence in the river would suddenly start the propellers without a warning of some sort. The burden of proving contributory negligence, which is upon the petitioner, has not been met.

## Claim of Edward J. Hugney

Claimant, Edward Hugney, was in the employ of the petitioner as a mate on the Motor Vessel Mathies on June 18, 1966. At the time of the accident, he was a member of the afterwatch and was performing his duties on the barges and towboat. He knew of the presence of the decedents in the water and he and a deckhand, Isaac Hughes, gave the alarm which caused the pilot to stop the propellers and immediately they rushed to the starbound gunnel of the barge. In an attempt to rescue the decedents, Hugney dove into the turbulent waters and was swept against the side of the barge. In some manner, the muscles in his neck and back were injured. He promptly reported his injury (Hugney Exs. 2, 4).

We find as a fact that the negligence of Pilot Cady was the proximate cause of the injuries sustained by this claimant. The negligence of Cady precipitated the danger to the decedents and caused the entry of Hugney into the river in a reasonable attempt to rescue them or one of them, and thus was a direct cause of Hugney's injuries. We find that Hugney was not guilty of contributory negligence nor did he assume the risk of injury in diving into the turbulent water in a reasonable attempt to rescue the decedents. The propellers had been disengaged when he made his dive. There was no evidence that he knew the children were dead when he dove into the river. Guca v. Pittsburgh Rys. Co., 367 Pa. 579, 80 A.2d 779 (1951); Corbin v. City of Philadelphia, 195 Pa. 461, 45 A. 1070, 49 L.R.A. 715 (1900); Restatement, Torts 2d, § 472.

## Damages

At the time of his death on June 18, 1966, Alec Sabo was 17 years of age, having been born on August 30, 1948. Prior to his death, he had graduated from California Senior High School where he had obtained average grades. In high school, Alec was popular, fun loving, and well disciplined. As a student, he evidenced an interest in library

work, dancing and music, and had developed a degree of proficiency in tap dancing and accordion playing. He was a good swimmer; his health was good. He worked Saturdays at the G. C. Murphy Company where his average earnings were $10 per week. Occasionally, he would perform tap dances for private affairs for a fee of from $3 to $5 for each performance. Alec intended to become an x-ray or medical technologist. In pursuit of this ambition he applied and was accepted for a September, 1966, enrollment at Cleveland Junior College located in Cleveland, Ohio, for a 15-month course which he thought would qualify him for employment in x-ray and medical laboratories. This college was a non-accredited private institution, whose graduates without further study and experience probably would not qualify as x-ray or medical technologists. However, he would have been employable in the laboratories in certain hospitals in this district and would probably have entered the labor force in 1968 with earning power of $4500 per year. Over the span of his work life, he would have been capable of earning upwards of $500,000. His life expectancy was 54.3 years. We estimate he would have worked 47 years.

No claim has been made on behalf of Alec's parents for his earnings during minority. We find Alec was emancipated. His administrator is entitled to funeral expenses in the amount of $2,135.-06.[5]

█ Under the Survival Act, the Estate of Alec Sabo is entitled to Alec's earnings from the date of death to the date of trial, less cost of maintenance. His estate is also entitled to the present worth at 6% of his probable future earnings from February 15, 1968 during the period of his work life, less the probable cost of his maintenance. We find the total of these amounts to be $48,000.

█ The estates of both decedents are entitled to an award for pain and suffering. Although Alec and Jane did not drown, they experienced the pangs of drowning persons prior to their contact with a propeller. It has been held that drowning produces conscious pain and suffering for which an award may be made.[6] The circumstances here were aggravated by an inescapable current of turbulent water which thrust each child against the side of the barge and irresistibly dragged them across the bottom of the 26-foot wide barge, under the ship and into a propeller. This force was sufficiently strong to force the mate, Hugney, into the side of the barge and injure his neck and back. This torturous trip replete with minor traumas would have taken only a few seconds, and in all probability they were conscious of the major pain produced by the whirling blades of a propeller. The bodily traumas inflicted by contacts with the barge and ship and the trauma and anguish of drowning prior to contact with a propeller were continuing. Undoubtedly, both would struggle desperately under the barge and ship to avoid the propellers. The experience would be frightful, terrifying and painful, though mercifully of short duration.

█ In these circumstances, we think pain and suffering prior to death is authorized by Pennsylvania law. Mental suffering is a legitimate element of damage where, as here, the decedents sustained bodily traumas accompanied by fright and mental suffering directly traceable to the peril in which the pilot's negligence placed them. Potere v. City

---

5. Petitioner's suggested Findings of Fact, p. 12; Sabo Ex. 30.

6. Olsen v. New York Central Railroad Company, 232 F.Supp. 28 (S.D.N.Y.1964), aff'd 341 F.2d 233 (2d Cir. 1965) (whether a drowning person undergoes pain and suffering is a question of fact); Grantham v. Quinn Menhaden Fisheries, Inc., 344 F.2d 590 (4th Cir. 1965), ($2,000 award); Meehan v. Central Railroad Company of New Jersey, 181 F.Supp. 594, 625–626 (S.D.N.Y.1960), ($10,000 award); Hickman v. Taylor, 75 F.Supp. 528, 530–533 (E.D.Pa.1947), aff'd 170 F.2d 327 (3d Cir. 1948), ($1,000 award).

of Philadelphia, *supra*, p. 589, 112 A.2d 100. See also, Hess v. Philadelphia Transp. Co., 358 Pa. 144, 148, 56 A.2d 89, 91 (1948), where Chief Justice Maxey cites with approval the following quotation from North German Lloyd Steamship Co. v. Wood, 18 Pa.Super. 488, 494 (1901):

> "Mental suffering, as distinct from bodily pain, can be considered in an action for damages for injury to the person, when such suffering is attendant upon and results from a physical injury: Wilcox v. Richmond & Danville Ry. Co., 52 Federal Reporter, 264."

We fix the award for pain and suffering for each at $5,000.[7]

Jane Dearth was 19 years of age at the time of her death, having been born on September 10, 1946. She had a pleasing and outgoing personality and was esteemed and admired by her friends and teachers. She was an outdoor girl and frequently hunted and fished with her father. She was a good swimmer. She graduated with honors from Brashear High School where she had been a member of the thespian troop and was interested in extra-curricular student activities, including music and poetry. She had an IQ of 140. She was in good health. She was extremely thrifty. At the time of her death, she was a second-year student at the Washington Hospital School of Nursing. As a student nurse, she was above average and had done superior work. She expected to graduate from nursing school in 1967, at the age of 20, and intended to begin nursing at the Washington Hospital in Washington, Pennsylvania. Shortly prior to the accident, she had been earning $14 for each night at the Golden Age Nursing Home (T., p. 824).

The starting salary for a registered staff nurse in Washington Hospital is about $500 per month, with increases every six months for three years. After six years, a salary of $590 per month could be expected. A head nurse earns between $550 to $630 a month; a supervisor between $565 to $715 per month; a faculty nurse earns $950 per month. Over the years of her work life, she would have been capable of earning approximately $445,000. Jane had a life expectancy of 60.8 years. We estimate she would have worked 44 years.

No claim has been made on behalf of Jane's parents for her earnings during minority. We find Jane was emancipated. Her administrator is entitled to funeral expenses in the sum of $1,559.[8]

■ Under the Survival Act, the Estate of Jane L. Dearth is entitled to Jane's earnings from the date of death to the date of trial, less cost of maintenance. Her estate is also entitled to the present worth at 6% of her probable future earnings from February 15, 1968 during the period of her work life, less the probable cost of her maintenance. We find the total of these amounts to be $44,000.

■ Although subject to some doubt, we have come to the conclusion that in the circumstances the actions of Pilot Cady were not willful and wanton or grossly reckless, and that the claimants are not entitled to an award for punitive damages.

■ Hugney's injuries partially disabled him and caused him to lay off work from July 10, 1966 to August 12, 1966. His doctor testified that on August 1st "he appeared to be free of any complaint." His doctor set August 12, 1966 as the date for his return to work (T., pp. 611, 618). The proof of his loss of earnings during that period was insufficient to make an award. Captain Hynde called by Hugney as for cross-ex-

---

7. Cf. State of Maryland for Use of Levin v. United States, 200 F.Supp. 475 (W.D. Pa.1961), rev'd on other grounds, 329 F.2d 722 (3d Cir. 1964), aff'd 381 U.S. 41, 85 S.Ct. 1293, 14 L.Ed.2d 205 (1965), in which Chief Judge Gourley awarded $5,000 for pain and suffering for the interval during which a plane plunged to the ground causing plaintiff's death.

8. Petitioner's suggested Findings of Fact, p. 13; Dearth Ex. 5.

amination, testified with respect to Hugney's Exhibit No. 5 that Hugney was paid $557.51 gross on August 7, 1966 (T., p. 915). This testimony was not rebutted. The claimant's counsel did not bring out an explanation of the "void" stamp appearing on this exhibit. Captain Hynde also testified that as a mate Hugney would have received his salary whether or not he worked (T., p. 922). Hugney claims "the pay he received on August 8, 1966 was not for any services performed, but a gratuity or gift from his employer."[9] Hugney's Exhibits 5 and 6 indicate that his gross earnings were $493 as of June 26, 1966, $245.37 as of July 10, 1966, and $557.31 as of August 7, 1966. They also indicate that he was at work for a substantial number of hours after the accident up until July 10, 1966. There was no proof that any of these gross earnings of Hugney during the period of his alleged disability, i. e., from June 18, 1966 to August 12, 1966, was a gift or gratuity from the petitioner. There was no attempt to allocate these payments to any other period. Thus it appears that Hugney's gross earnings during the period of his alleged disability amounted to $1,295.68. We find that Hugney was paid his mate's salary for the period he was off work. Having thus been paid salary by the petitioner, he is not entitled to any additional amount for maintenance. Actually Hugney received more money by way of salary than he would have received by way of an award for maintenance during the period he was off work.

He is entitled to medical expenses in the sum of $25. For pain, suffering and inconvenience, he is entitled to the sum of $300.

This opinion shall be deemed to embody findings of fact and conclusions of law required by Rule 52, Fed.R.Civ.P., 28 U.S.C.A.

An appropriate order will be entered.

## MEMORANDUM SUR MOTIONS TO AMEND

The petitioner, Consolidation Coal Company, moves to amend or make additional findings and to alter or amend the judgments entered, so that the Survival Action damages allocable to the Estate of Alec Sabo will not exceed $30,000; that the Survival Action damages allocable to the Estate of Jane Dearth will not exceed $23,000; and that the pain and suffering awards will be more in accordance with the evidence.

Oral argument was held and the briefs in support of and against the motions have been considered. In my opinion the motions should be denied.

Judgments were entered against Consolidation Coal Company and in favor of the Estate of Alec Sabo in the sum of $55,135.06, and in favor of the Estate of Jane Dearth in the sum of $50,559.00, and in favor of Edward Hugney in the amount of $325.00.

The petitioner contends that the credible evidence is insufficient to sustain that portion of the judgments in favor of the estates which reflect the projected net earnings of Alec Sabo in the amount of $48,000 and of Jane Dearth in the amount of $44,000.

Actions for the benefit of the estates of deceased minors present speculative difficulties in arriving at proper compensation. Usually low verdicts are awarded " 'because of the extreme difficulty in proving damages * * *.' " Cf. McSparran v. Pennsylvania Railroad Company, 258 F.Supp. 130, 144 (E.D. Pa.1966), relied upon by petitioner.[1]

---

9. Hugney's brief, p. 16. Obviously, the gross pay referred to was $557.31 paid on August 7, 1966 (Hugney's Ex. 5).

1. In this case, after verdict of $15,171.-95 under the Survival Act for estate of a 16 year old girl, and grant of a new trial limited to damages under the Survival Act, those damages were settled for $45,000, Troutman, Pennsylvania Damages in Personal Injury Cases, p. 92 (1967 cum. supp.). And see, Beebe v. Highland Tank and Manufacturing Company, 373 F.2d 886 (3d Cir. 1967), verdict of $72,200 under Survival Act for estate of a 21 year old male reduced by remittitur to around $57,000; Blisard

However, in the cases of Alec Sabo, a 17 year old boy, and Jane Dearth, a 19 year old girl, their power to earn money in the future was adequately proved. Both children were intelligent, industrious and thrifty; Jane was unusually bright. Of course, there are elements of conjecture involved but these in the main have been resolved against the estates. For instance, in Alec's case, no consideration was given to promotions or compensation for overtime work, which latter is most likely in the work of a hospital technician. In Jane's case, no consideration was given to the probability that her prospective income over the years as a trained nurse would be periodically raised to meet the ever increasing inflationary rise in the cost of living (T., p. 673). Neither have I considered that the never-ending shortage of nurses would in the future, as in the past, probably result in higher salaries. I have not considered the probability that after attaining the age of 65, Alec would have retained some earning power as a hospital technician for an additional 6.3 years, and Jane would have retained some earning power as a faculty nurse, albeit on a decreasing scale, for an additional 15 years.[2] Almost certainly each would have lost pensions from the date of their retirement to the end of their lives. Amounts based on these periods of their respective life expectancies were not considered or included in the awards.

Notwithstanding, the petitioner contends that the credible evidence is insufficient to sustain the awards for future loss of earning power.

With respect to Alec, the evidence supports the conclusion that during his work life of 47 [46] years, his potential earning power could have amounted to more than $600,000 (T., p. 674). I found his future earning power to amount to only $500,000. From this was deducted the cost of maintenance which I estimated at $360,000. The remainder of $140,000 was reduced to $48,080.50, the present worth at 6%[3] over a work life of 45 years, to which was added a small increment of $157.36, being the earnings, less maintenance, prior to trial, or $48,237.86 rounded out to $48,000.

With respect to Jane, the evidence supports the conclusion that during her work life of 44 years, her potential earnings could have amounted to more than $445,000.[4] Jane intended to enter the profession of nursing. In view of inflationary trends and the steadily-increasing salaries and fees for trained nurses, a larger total would have been justified. From a total of only $440,000, I estimated her cost of maintenance at $316,800. The remainder of $123,200 was reduced to $43,072.40, the present worth at 6%[5] over a work life of 44 years, to which was added $1120 of earnings, less maintenance, prior to trial, rounded out to $44,000.

v. Vargo, 286 F.2d 169 (3d Cir. 1961), verdict of $50,000 under the Survival Act for estate of an 8½ year old boy; Jamison v. A. M. Byers Company, 222 F.Supp. 475 (W.D.Pa.), rev'd on other grounds, 330 F.2d 657 (3d Cir. 1964), verdict of $45,000 under the Survival Act for estate of an unmarried 23 year old male; McKirdy v. Cascio, 142 Conn. 80, 111 A.2d 555 (1955), verdict of $50,000 for estate of an 18 year old male.

2. The life expectancies of Alec and Jane were 54.3 years (T., p. 745) and 60.8 years (T., p. 859), respectively. Life Tables, Vital Statistics of the United States, 1964, published by the United States Department of Health, Education and Welfare, vol. II, § 5, p. 5-8.

3. Financial Compound Interest and Annuity Tables, 3d ed., Financial Publishing Company, p. 691; Am.Jur.2d Desk Book, Doc. No. 133, p. 332.

4. There was evidence that during the first 10 years Jane would have earned $72,840. "This would be a low figure" (T., p. 805). For the remaining 34 years of her work life at $11,400 per year, the annual salary of a faculty nurse at $950 per month, which does not take into consideration increases due to inflation or shortage of nurses, she would have earned $387,600, or a total of $460,440.

5. See f. n. 3, supra.

The cost of maintenance of the decedents was estimated at 72%; it would include food, clothing, shelter, medical expenses, recreation, and other necessities. The amount is that sum which the fact finder would expect the decedent to spend as a matter of necessity in a thrifty and economical manner. The cost of maintenance is not limited to that sum which would be required for bare subsistence nor does it contemplate luxurious spending; the amount varies according to a person's station in life. The families of both decedents were exceedingly thrifty; the decedents were likely to be the same. There is no requirement that the evidence as to probable cost of maintenance be direct, fully detailed, and established with mathematical exactness; it is only necessary that it be sufficient to enable the fact finder to make a fair determination. Cf. Blackburn v. Aetna Freight Lines, Inc., 368 F.2d 345 (3d Cir.1966); Curnow v. West View Park Company, 337 F.2d 241 (3d Cir.1964); and see the pertinent observations on this subject made in "Damages in Personal Injury and Death Cases in Pennsylvania—A Supplement", Vol. XXVI Pa. Bar Ass'n Q. (1954), at p. 35.

An appropriate order will be entered.